UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PATRICK E. O'LEARY,

       Petitioner,

v.                                        Case No: 2:12-cv-599-FtM-29CM

SECRETARY, DOC and FLORIDA
ATTORNEY GENERAL,

       Respondents.

_____

## OPINION AND ORDER

This matter comes before the Court upon a petition for habeas corpus relief filed pursuant to 28 U.S.C. § 2254 by Patrick E. O'Leary ("Petitioner") who is presently confined at the Avon Park Correctional Institution in Avon Park, Florida (Doc. 1, filed November 2, 2012). Petitioner, proceeding *pro se*, attacks the convictions and sentences entered by the Twentieth Judicial Circuit Court in Lee County, Florida for sexual activity with a child, promoting a sexual performance by a child, and battery. Id. Respondent filed a response to the petition (Doc. 19). Petitioner filed a reply (Doc. 13).

Petitioner raises thirty-six claims in his petition. Upon due consideration of the pleadings and the state court record, the Court concludes that each claim must be denied. Because the Court may resolve the Petition on the basis of the record, an evidentiary

hearing is not warranted.  See <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) (if the record refutes the factual allegations in the petition or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing).

**I.**   **Background and Procedural History**

On April 7, 2004, Petitioner was charged by amended information with sexual activity with a child, in violation of Florida Statute § 794.011(8)(b) (counts one and two); promoting a sexual performance by a child in violation of Florida Statute § 827.071(3) (counts three and four); violation of an injunction against domestic violence in violation of Florida Statute § 741.31(4) (count five); and lewd or lascivious molestation in violation of Florida Statute § 800.04(5)(c)(2) (count six) (Ex. 1).[1]

Petitioner filed a pre-trial motion to suppress two videotapes showing him engaging in sexual activity with one of the victims (Ex. 2).  The motion alleged that the tapes had been illegally seized by private citizens at the direction of law enforcement officers.  <u>Id.</u>  After holding an evidentiary hearing on the motion (Ex. 3), the trial court concluded that the facts

---

[1] Unless otherwise indicated, references to exhibits or appendices are to those filed by Respondent on April 4, 2013 (Doc. 10).  Citations to the trial transcript, located in exhibit seven, will be cited as (T. at __).

demonstrated that law enforcement had not been involved with the retrieval of the videotapes from Petitioner's home, and the motion to suppress was denied (Ex. 3 at 254).

Petitioner filed a second pre-trial motion asking the trial court to appoint an expert to ensure that the videotapes had not been tampered with (Ex. 4). The motion was denied (Ex. 5).

Petitioner filed a third pre-trial motion seeking to strike the state's motion to introduce evidence of prior bad acts (Ex. 6). The motion argued that the proposed evidence of collateral crims was dissimilar. Id. Petitioner also urged that the state had delayed filing the motion to introduce the evidence until the eve of trial, leaving defense counsel inadequate time to object. Id. The motion was heard by the trial court and denied (Ex. 7).

After a jury trial, Petitioner was found guilty on counts one and two with a specific finding of sexual penetration as to count one, but not count two (T. at 618). Petitioner was found guilty of counts three and four, not guilty of count five, and guilty of the lesser included charge of battery on count six. Id. at 618-19. Petitioner was sentenced to a total of twenty-one years in prison which was below the statutory maximum of ninety years (Ex. 9 at 419-22). Petitioner's convictions and sentence were per curiam affirmed by Florida's Second District Court of Appeal (Ex. 11).

On April 11, 2008, Petitioner filed a state habeas petition alleging ineffective assistance of appellate counsel (Ex. 13). The petition was denied (Ex. 14).

On September 29, 2009, Petitioner filed a motion pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure ("Rule 3.850 motion").  Petitioner followed his Rule 3.850 motion with two amended motions for post-conviction relief (Ex. 17; Ex. 19).  The motions were denied on July 13, 2011 (Ex. 20).  The post-conviction court specifically concluded that Petitioner's amended motion for post-conviction relief was untimely and procedurally barred (Ex. 20 at 2).  Florida's Second District Court of Appeal *per curiam* affirmed. O'Leary v. State, 98 So. 3d 577 (Fla. 2d DCA 2012).

The instant petition was filed on October 31, 2012 (Doc. 1).

## II.   Governing Legal Principles

### A.   Standard of Review Under the Antiterrorism Effective Death Penalty Act ("AEDPA")

Pursuant to the AEDPA, federal habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

- 4 -

28 U.S.C. § 2254(d).  This standard is both mandatory and difficult to meet.  White v. Woodall, 134 S. Ct. 1697, 1702 (2014).  A state court's summary rejection of a claim, even without explanation, qualifies as an adjudication on the merits which warrants deference.  Ferguson v. Culliver, 527 F.3d 1144, 1146 (11th Cir. 2008).  Notably, a state court's violation of state law is not sufficient to show that a petitioner is in custody in violation of the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Wilson v. Corcoran, 562 U.S. 1, 16 (2010).

"Clearly established federal law" consists of the governing legal principles, rather than the *dicta*, set forth in the decisions of the United States Supreme Court at the time the state court issued its decision. White, 134 S. Ct. at 1702; Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)).  That said, the Supreme Court has also explained that "the lack of a Supreme Court decision on nearly identical facts does not by itself mean that there is no clearly established federal law, since 'a general standard' from [the Supreme Court's] cases can supply such law." Marshall v. Rodgers, 133 S. Ct. 1446, 1449 (2013) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  State courts "must reasonably apply the rules 'squarely established' by [the Supreme] Court's holdings to the facts of

each case.  White, 134 S. Ct. at 1706 (quoting Knowles v. Mirzayance, 556 U.S. 111, 122 (2009)).

Even if there is clearly established federal law on point, habeas relief is only appropriate if the state court decision was "contrary to, or an unreasonable application of," that federal law. 29 U.S.C. § 2254(d)(1).  A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. Ward v. Hall, 592 F.3d 1144, 1155 (11th Cir. 2010); Mitchell v. Esparza, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, Brown v. Payton, 544 U.S. 133, 134 (2005); Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir. 2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Bottoson, 234 F.3d at 531 (quoting Williams, 529 U.S. at 406).  The petitioner must show that the

state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." White, 134 S. Ct. at 1702 (quoting Harrington v. Richter, 562 U.S. 86 (2011)). Moreover, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." Knowles, 556 U.S. at 122.

Finally, when reviewing a claim under § 2254(d), a federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) ("a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding") (dictum); Burt v. Titlow, 134 S. Ct. 10, 15-16 (2013) (same).

**B.   Standard for Ineffective Assistance of Counsel**

In Strickland v. Washington, the Supreme Court established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered

ineffective assistance. 466 U.S. 668, 687-88 (1984).  A petitioner must establish that counsel's performance was deficient and fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense. Id.  This is a "doubly deferential" standard of review that gives both the state court and the petitioner's attorney the benefit of the doubt. Burt, 134 S. Ct. at 13 (citing Cullen v. Pinholster, 131 S. Ct. 1388, 1403 (2011)).

The focus of inquiry under Strickland's performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688-89.  In reviewing counsel's performance, a court must adhere to a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.  Indeed, the petitioner bears the heavy burden to "prove, by a preponderance of the evidence, that counsel's performance was unreasonable[.]" Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006).  A court must "judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct," applying a "highly deferential" level of judicial scrutiny. Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (quoting Strickland, 466 U.S. at 690).

As to the prejudice prong of the Strickland standard, Petitioner's burden to demonstrate prejudice is high. Wellington

v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002). Prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. That is, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. At 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

The Strickland standards also apply to ineffective assistance of appellate counsel claims. See Smith v. Robbins, 528 U.S. 259 (2000). Appellate counsel's performance will be deemed prejudicial only if "the neglected claim would have a reasonable probability of success on appeal[.]" Heath v. Jones, 941 F.2d 1126, 1132 (11th Cir. 1991).

**C.   Exhaustion and Procedural Default**

The AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless a petitioner has exhausted all means of available relief under state law. Specifically, the AEDPA provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
>
> > (A) the applicant has exhausted the remedies available in the courts of the State; or

(B)

    (i)        there is an absence of available State corrective process; or

    (ii)     circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1) (2012).

Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights[.]" Duncan v. Henry, 513 U.S. 364, 365 (1995) (citing Picard v. Connor, 404 U.S. 270, 275-76 (1971)).  The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law claim.  Snowden v. Singletary, 135 F.3d 732 (11th Cir. 1998).  In addition, a federal habeas court is precluded from considering claims that are not exhausted and would clearly be barred if returned to state court. Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991) (if a petitioner has failed to exhaust state remedies and the state court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, there is a procedural default for federal habeas purposes regardless of the decision of the last state court

to which the petitioner actually presented his claims).  Finally, a federal court must dismiss those claims or portions of claims that have been denied on adequate and independent procedural grounds under state law. Coleman, 501 U.S. at 750.  If a petitioner attempts to raise a claim in a manner not permitted by state procedural rules, he is barred from pursuing the same claim in federal court. Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994).

A petitioner can avoid the application of procedural default by establishing objective cause for failing to properly raise the claim in state court and actual prejudice from the alleged constitutional violation. Spencer v. Sec' y, Dep't of Corr., 609 F.3d 1170, 1179-80 (11th Cir. 2010). To show cause, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." Wright v. Hopper, 169 F.3d 695, 703 (11th Cir. 1999); Murray v. Carrier, 477 U.S. 478 (1986).  To show prejudice, a petitioner must demonstrate there is a reasonable probability the outcome of the proceeding would have been different. Crawford v. Head, 311 F.3d 1288, 1327-28 (11th Cir. 2002).

A second exception, known as the fundamental miscarriage of justice, only occurs in an extraordinary case, where a "constitutional violation has probably resulted in the conviction

of one who is actually innocent[.]" <u>Murray v. Carrier</u>, 477 U.S. 478, 479-80 (1986).   Actual innocence means factual innocence, not legal insufficiency.   <u>Bousley v. United States</u>, 523 U.S. 614, 623 (1998).   To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995).   In addition, "[t]o be credible, a claim of actual innocence must be based on [new] reliable evidence not presented at trial." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting <u>Schlup</u>, 513 U.S. at 324).

## III. **Discussion**

### A.   **Claim 1**

Petitioner asserts that the trial court erred when it allowed the state to present <u>Williams</u> Rule[2] evidence regarding Petitioner's alleged sexual activity with victims T.O. and E.G. (Doc. 1 at 8). Specifically, Petitioner argued in his brief on direct appeal[3] that

---

[2] The <u>Williams</u> Rule is based on <u>Williams v. State</u>, 110 So. 2d 654 (Fla. 1959) in which evidence of collateral crimes is admissible at a jury trial when it is not introduced to prove the bad character or criminal propensity of the defendant, but is used to show motive, intent, knowledge, *modus operandi*, or lack of mistake.

[3] This claim is exhausted only to the extent it was raised in the state courts. <u>See</u> discussion <u>supra</u> Part II(C). Accordingly, the Court will assume that the substance of this claim is the same as Petitioner presented in his brief on direct appeal (Ex. 10).

"[w]ith E.G., the acts were basically grabbing her buttocks and breast, with both T.O. and E.G. indicating it appeared to be joking around with no showing of intent – as opposed to what occurred with T.O., where there was masturbation of [Petitioner] and oral sex."(Ex. 10 at 23).  Petitioner argued:

> Grabbing breasts and buttocks through clothing is a far different thing [than] being naked in bed and engaging in cunnilingus, fellatio, and masturbation whether or not the acts are videotaped.  The fact that both alleged victims were females of about the same age and that the acts occurred in the same house is not sufficiently similar.  Furthermore, those acts complained of by E.G. occurred in the living portion of the house when other persons were present, while the acts on the videotapes occurred in the mother's bedroom when no one else was present.  Additionally, there was no proof as to when the acts occurred with E.G. – perhaps the same year, but not necessarily even the same month.

(Ex. 10 at 28).  After considering arguments from both Petitioner and the state, the trial court concluded that there was "clear and convincing evidence that would hold findings to admit the Williams Rule.  I believe there is sufficient evidence to admit them to either case going either way, that all of that is inherent[.]" (T. at 448-49).[4]

---

[4] Florida's general rule about the admissibility of prior bad act evidence is found at Florida Statute § 90.404(2)(a):

> Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue such as proof of

To the extent that Claim 1 can be liberally construed as raising a federal constitutional challenge to the admission of evidence regarding Petitioner's alleged molestation of E.G. at his trial, the claim is unexhausted because Petitioner did not present the federal constitutional nature of this claim to the state appellate court on direct appeal.   When briefing this claim, Petitioner did not state, or even suggest, that it was a federal claim about due process or any other federal constitutional

---

motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

Id.   Florida's "prior bad acts" rule for child molestation cases is found at Florida Statute § 90.404(2)(b):

1. In a criminal case in which the defendant is charged with a crime involving child molestation, evidence of the defendant's commission of other crimes, wrongs, or acts of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.

2. For purposes of this paragraph, the term "child molestation" means conduct proscribed by s. 794.011 or s. 800.04 when committed against a person 16 years of age or younger.

Id.   Accordingly, for child molestation cases in the state of Florida, prior bad act evidence "is admissible, and may be considered for its bearing on any matter to which it is relevant." Id.

guarantee.    Rather,   he   argued   that   Petitioner's   alleged
molestation  of  E.G.  was  dissimilar  to  his  sexual  activity  with
T.O.  and  that  "the  trial  judge  failed  to  act  as  a  gatekeeper;
failed  to  weigh  the  probative  value  and  the  prejudicial  effect  of
the   proffered   testimony;   and   failed   to   prevent   inadmissible
evidence   from   going   before   the   jury."   (Ex.   10   at   28-29).
Petitioner  cited  exclusively  to  state  decisional  law  in  support  of
his  arguments,  primarily  McClean v. State,  934  So.  2d  1248  (Fla.
2006)  (cited  for  the  proposition  that  the  similarity  of  a  previous
episode  of  child  molestation  to  the  charged  offense  is  the  key
consideration  in  admitting  such  evidence)  and  Heuring v. State,
513  So.2d  122,  124  (Fla.  1987)  ("Similar  fact  evidence  that  the
defendant    committed    a    collateral    offense    is    inherently
prejudicial.  Introduction  of  such  evidence  creates  the  risk  that
a  conviction  will  be  based  on  the  defendant's  bad  character  or
propensity  to  commit  crimes,  rather  than  on  proof  that  he  committed
the  charged  offense.").

Petitioner's  failure  to  exhaust  the  federal  basis  of  his  claim
renders  it  both  unexhausted  and  procedurally  defaulted  because
Petitioner  is  barred  by  state  procedural  rules  from  returning  to
state  court  to  exhaust  the  federal  constitutional  nature  of  his
claim.   Petitioner  has  made  none  of  the  requisite  showings  to
excuse  his  default,  and  the  default  bars  federal  habeas  review  of

Claim 1. <u>See</u> <u>Duncan v. Henry</u>, 513 U.S. 364, 366 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guarantee by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

To the extent Petitioner asserts that the trial court erred under Florida law by admitting evidence of Petitioner's alleged molestation of E.G., the claim is not cognizable on federal habeas review.  "As a general rule, a federal court in a habeas corpus case will not review the trial court's actions concerning the admissibility of evidence[,]" <u>Alderman v. Zant</u>, 22 F.3d 1541, 1555 (11th Cir. 1994), because the state court "has wide discretion in determining whether to admit evidence at trial[.]" <u>Lynd v. Terry</u>, 470 F.3d 1308, 1314 (11th Cir. 2006); <u>see also Baxter v. Thomas</u>, 45 F.3d 1501, 1509 (11th Cir. 1985) (federal habeas corpus is not the proper vehicle to correct evidentiary rulings); <u>Boykins v. Wainwright</u>, 737 F.2d 1539, 1543 (11th Cir. 1984) (federal courts are not empowered to correct erroneous evidentiary rulings in state court except where rulings deny petitioner fundamental constitutional protections).  Therefore, it is not for this Court on federal review to decide whether the state trial court erred by admitting the evidence under Florida law; rather, this Court may only consider whether the state trial court unreasonably applied

clearly established federal law, "as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d).   Petitioner has not made this showing.

Even assuming *arguendo* that this claim has been exhausted and raises a federal due process claim, Petitioner is not entitled to habeas relief because he has failed to identify a Supreme Court case holding that the admission of similar fact or collateral crime evidence in similar circumstances was unconstitutional. Therefore, Petitioner has failed to show that the Second District Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established law. See Quintero v. McNeil, No. 4:08cv318/RH/MD, 2009 WL 1833872 (N.D. Fla. June 23, 2009) (denying habeas relief on ground that there was no clearly established federal law as determined by the Supreme Court suggesting that the admission of evidence that a defendant had committed sexual battery on another child violated due process); Lutz v. Palmer, No. 3:11cv334/LAC/EMT, 2012 WL 4660685, at *16 (N.D. Fla. Sep. 10, 2012) ("Petitioner has pointed to no Supreme Court precedent holding that the admission of relevant evidence, even evidence of a defendant's other bad acts, violates the Due Process Clause").[5]

---

[5] The Supreme Court has addressed whether prior acts evidence is permissible under the Federal Rules of Evidence, see Old Chief v. United States, 519 U.S. 172 (1997), Huddleston v. United States,

In addition to being dismissed as unexhausted and procedurally barred, Claim 1 is denied pursuant to 28 U.S.C. § 2254(d).

**B.   Claims 2, 8, 9, and 32**

In Claim 2, Petitioner asserts that the trial court erred by refusing to suppress the videotapes of Petitioner engaging in sexual activity with T.O. (Doc. 1 at 9-10).  In Claim 8, Petitioner asserts that trial counsel was ineffective for failing to "adequately investigate the illegally obtained videotapes." (Doc. 1 at 19).  Specifically, Petitioner alleges that he never gave permission to the people who entered his trailer to retrieve the videotapes (Ex. 15 at 5-6). In Claim 9, Petitioner asserts that trial counsel was ineffective for failing to "prepare adequately and present proper argument during the hearing on [Petitioner's] motion to suppress." (Doc. 1 at 20).  In Claim 32, Petitioner asserts that counsel was ineffective for failing "to properly prepare, adequately investigate and effectively argue that the state trial court should suppress the unlawfully obtained, illegally seized, and unlawfully viewed videotapes of a sexually explicit nature which had been unlawfully removed from

---

485 U.S. 681 (1988).  However, the Court has not explicitly addressed admission of such evidence in constitutional terms.

[Petitioner's] private residence without his consent or permission and without a lawful search warrant being issued." (Doc. 1 at 56).[6]

Petitioner raised the issue presented in Claim 1 in his brief on direct appeal (Ex. 10).  Petitioner argued in the brief:

> The main evidence against [Petitioner] consisted of two videotapes showing him having sexual contact with T.O., the fifteen year-old daughter of his paramour.  A motion to suppress evidence indicated that the tapes were obtained from [Petitioner's] home by friends, and argued it to be at the behest and with approval of law enforcement, and thus illegally.  If this allegation is true, [then] the evidence has to be suppressed and this case becomes a two person swearing match.
>
> The judge's denial came at the end of the suppression hearing:
>
>> I just can't accept the fact that law enforcement was involved in this.  It just – it's just too improbable, you know.
>
> The issue was raised again by a subsequent defense attorney prior to trial and summarily denied.

---

[6] Claim 32 was raised in Petitioner's amended Rule 3.850 motion (Ex. 17) which was rejected by the post-conviction court as procedurally defaulted since it was untimely (Ex. 20 at 2). However, Claim 32 will be addressed to the extent the issues raised therein were already raised in Claims 2, 8, and 9. See discussion, infra, Part III(T) (dismissing Claims 25, 27, 31, and 35 as procedurally barred); see also 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

(Ex. 10 at 31-32) (internal citations to the record omitted). Florida's Second District Court of Appeal affirmed the trial court's rejection of this claim (Ex. 11).

Petitioner does not explain how the state court's denial of this claim was contrary to clearly established federal law or based upon an unreasonable determination of the facts. Rather, he directs this Court to his brief on appeal and points to inconsistencies in witness testimony and minor inaccuracies in police reports (Ex. 10 at 32-43). Title 28 U.S.C. § 2254(e)(1) provides that factual determinations made by a state court are "presumed to be correct," and that the habeas petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." See also Ward, 592 F.3d at 1166 ("[W]e must presume the state court's factual findings to be correct by clear and convincing evidence."). Clear and convincing evidence entails proof that a claim is "highly probable," a standard requiring more than a preponderance of the evidence but less than proof beyond a reasonable doubt. United States v. Owens, 854 F.2d 432, 436 n. 8 (11th Cir. 1998). Upon review of the record, particularly the transcript of the trial court's evidentiary hearing on Petitioner's motion to suppress, the Court concludes that Petitioner has not overcome the trial court's factual

determination that the police were not involved in the retrieval of video evidence from Petitioner's home.

At the hearing on the motion to suppress, Lisa Olsson ("Olsson"), T.O.'s mother, testified that she had lived with Petitioner for eleven or twelve years (Ex. 3 at 24).  Petitioner and Olsson had active injunctions forbidding either of them from contacting the other. Id. at 25.  Olsson received a telephone call informing her that Todd Layton ("Layton") had found a videotape at Petitioner's trailer, so Olsson went to the trailer to see what it was. Id. at 26.  She viewed a portion of the videotape that showed her daughter, T.O., engaged in sexual activity with Petitioner and contacted the police. Id. at 29.  She testified that she had not communicated with any law enforcement officer until after she retrieved the videotape and that the police had not given her permission to retrieve the videotape or to enter Petitioner's trailer. Id. at 32, 37.

Olsson testified that she became aware of a second videotape after her friend, Kurt Thornton ("Thornton"), told her that Petitioner had called him from jail and asked him to retrieve a second videotape from his trailer (Ex. 3 at 35, 54).  She never heard any law enforcement officer give Thornton permission to retrieve the videotape from Petitioner's trailer. Id. at 37, 39.

Layton testified that after a night out drinking with Petitioner, he spent the night at Petitioner's trailer (Ex. 3 at 85, 87). Petitioner was not there. Id. at 87. When Layton woke the next morning, he accidentally stepped on Petitioner's video camera. Id. at 87-88. He turned on the camera to see if it was broken, and viewed Petitioner and T.O. engaged in sexual activity. Id. at 88. He was unsure what to do, so he left the camera at the trailer and went to work. Id. He called his sister several hours later and told her what he found. Id. at 88-89. Layton stated that he did not go with his sister and Olsson to retrieve the videotape. Id. at 90. He testified that he did not speak with the police until after Olsson retrieved the first videotape from Petitioner's trailer.

Layton testified that he learned of a second videotape when Thornton called Olsson to tell her that Petitioner had asked him (Thornton) to retrieve the second videotape from his trailer (Ex. 3 at 92). He stated that Thornton told him that the only time the police were notified about the second videotape was after he brought it back to Olsson's house. Id. at 93. He personally never called the police. Id. at 101-102.

Layton's sister, Krista Pilkington ("Pilkington"), testified that she contacted Olsson after her brother called her about the first videotape (Ex. 3 at 64). When she learned of the tape's

existence, she contacted the Department of Children and Families which advised her to contact law enforcement. Id. at 66, 76. She then contacted the Sherriff's Office which advised her to contact the Department of Children and Families. Id. at 67, 78. After she and Olsson retrieved the first videotape from Petitioner's trailer, they contacted the police. Id. at 69.

Thornton testified that after Petitioner was arrested, Petitioner called him from jail and requested that Thornton retrieve the second videotape from his trailer (Ex. 3 at 155-56). He testified that he retrieved the videotape (Ex. 3 at 156-57). The police were at his house when he arrived back with the videotape, and Thornton assumed that Layton had called them. Id. at 162.

Detective Anthony Gianfrancesco ("Gianfrancesco") of the Lee County Sheriff's Office testified that he became involved with the case when he was dispatched to Olsson's residence in response to what he believed was a violation of injunction report (Ex. 3 at 124, 127, 129). After he arrived, he was informed by Olsson that she had a sexually explicit videotape. Id. at 126. He contacted his supervisor, and an investigation was initiated. Id. at 127. He never spoke with anyone about the first videotape prior to Olsson giving it to him. Id. at 128.

Detective John Long testified that he became aware of the first videotape when Gianfrancesco informed him of it (Ex. 3 a 107). He stated that he had not spoken with any of the parties involved in the case until after Gianfrancesco informed him of the tape. Id. at 110.   He also testified that Gianfrancesco had not been instructed to tell civilians to obtain the second videotape. Id. at 112.   When asked why another police officer, Jennifer Soto ("Soto"), had indicated in a burglary report, written six days after the tapes were found, that Olsson, Layton, and Thornton had entered Petitioner's trailer with the permission of the Lee County Sheriff's Office, Long stated that there must have been a miscommunication. Id. at 115.   He stated that "[Soto] might be talking about property because I know that there was, I believe, some property retrieved after all this had taken place, or [Olsson] wanted property after this had taken place, but I'd – I'd never said that we give permission to enter a trailer." Id. at 115-16.

In contrast to Long's testimony, Soto testified that she investigated a burglary of Petitioner's trailer that was reported shortly after his arrest (Ex. 3 at 231).   She contacted Long after she saw on television that Petitioner had been arrested and Long told her that "he had told them to go back and get their stuff." Id. at 233.   When asked what type of items were said to be missing in the burglary, Soto testified that the items did not include a

videotape, but were "[p]ersonal items such as a computer and a child's bicycle." Id. at 236.

   After hearing the testimony and argument from both sides, the trial court recognized that whether the police had ordered civilians to confiscate the video tapes was a factual issue and concluded that it was too improbable to accept that the police were involved.  The motion to suppress was denied (Ex. 3 at 254). Petitioner has not presented clear and convincing evidence to overcome the presumption of correctness afforded the trial court's conclusion, and Claim 1 is denied pursuant to 28 U.S.C. § 2254(d).

   Claims 8, 9, and 32 appear to be based upon Petitioner's belief that his defense counsel did not adequately present his case at the evidentiary hearing on his motion to suppress the videotapes. Again, Petitioner points to inconsistencies in police reports and witness statements between the evidentiary hearing and Petitioner's trial (Ex. 15; Ex. 17).  He also argues that he did not give Thornton permission to enter his apartment, and "[a] reasonable investigation would have uncovered this documentary PROOF that the State's witnesses lied under oath." (Ex. 15 at 17) (emphasis in original).  Petitioner states that "[w]ith no permission given to enter his home and seize (steal) the tapes, both should have been suppressed.  Notwithstanding that Lisa Olssen acted as an agent of the Lee County Sheriff's Department,

even a true civilian cannot burglarize a private home to obtain evidence. Counsel's obvious ignorance of the law, and failure to investigate resulted in the illegally obtained tapes being admitted into evidence at trial." <u>Id.</u> at 5-6. The post-conviction court rejected these claims as follows:

> The Fourth Amendment to the Constitution restricts the government from illegally searching a home or individual. This protection covers only governmental action, and is inapplicable to a search performed by a private individual who is not acting as a governmental agent. <u>U.S. v. Jacobsen</u>, 466 U.S. 109 (1984). De minimis or incidental interaction between a private citizen and governmental agents prior to or during a search or seizure performed by a private citizen will not trigger Fourth Amendment scrutiny. <u>Glasser v. State</u>, 737 So. 2d 597 (Fla. 4th DCA 1999). Furthermore, the exclusionary rule is not applicable to illegal searches performed by private citizens. <u>Garner v. State</u>, 729 So. 2d 990 (Fla. 5th DCA 1999) (citing <u>Burdeau v. McDowell</u>, 256 U.S. 465 (1921)). With regards to post-conviction motions claiming a failure to litigate a Fourth Amendment claim, a defendant must prove that his Fourth Amendment claim is meritorious. <u>Zakrzewski v. State</u>, 866 So. 2d 688, 694 (Fla. 2003) (<u>quoting</u> <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 375 (1986)).
>
> The record reflects that counsel did in fact file a motion to suppress both tapes on the grounds Defendant alleges in Claim[s] B and C of his post-conviction motion, which was denied by the Court. To the extent that Defendant feels counsel did not adequately investigate the motion to suppress, Kurt Thornton testified at trial that he was given permission from the Defendant to search his trailer. While Mr. Thornton eventually gave

the tape he found in Defendant's trailer to law enforcement officers, there is no testimony or evidence that Mr. Thornton was acting as a governmental agent when he searched Defendant's trailer. Even if, as Defendant asserts, Mr. Thornton entered his house illegally, this would not trigger Fourth Amendment scrutiny of the search and seizure of the videotapes, as Mr. Thornton was a private citizen who was not acting as a governmental agent. Accordingly, Defendant has failed to demonstrate prejudice, and Claim B of Ground One of Defendant's original post-conviction motion is without merit.

Claim C of Ground One of Defendant's original post-conviction motion is an extension of his prior argument in Claim B. Here he argues that his counsel was ineffective, because he did not prepare for a suppression hearing and "present proper argument thereat." He further contends that counsel failed to argue that Lisa Olsson never lived with the Defendant, and that, therefore, Ms. Olsson's search of the Defendant's trailer violated his Fourth Amendment rights. However, as noted above in the Court's reasoning as to Claim B, *supra*, counsel filed a motion to suppress based upon the grounds that Lisa Olsson was acting as a government agent, and the Court found no credence to that argument and denied the motion. Furthermore, because the trial court determined that Ms. Olsson was not a government agent, even if she illegally entered the Defendant's home, such a search and seizure by a private citizen who is not a governmental agent will not trigger Fourth Amendment scrutiny. Accordingly, Defendant has failed to prove either ineffective performance or prejudice; therefore, Claim C is without merit.

(Ex. 20 at 7-8). The post-conviction court's denial of this claim was *per curiam* affirmed by Florida's Second District Court of Appeal (Ex. 21).

In order to prevail on this ineffective assistance claim, Petitioner must establish deficient performance and prejudice under Strickland, and "must also prove that his Fourth Amendment claim is meritorious[.]" Kimmelman v. Morrison, 477 U.S. 365, 375 (1986). Petitioner does not satisfy these conditions. The Fourth Amendment regulates state actors. The Fourth Amendment is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any government official." United States v. Jacobsen, 466 U.S. 109, 113 (1984). The post-conviction court listened to the testimony of the witnesses at the evidentiary hearing and concluded that the police were not involved in the seizure of Petitioner's videotapes. Even had counsel produced evidence indicating that Thornton or Olsson were illegally inside of Petitioner's trailer, it would not have affected this conclusion. Accordingly, Petitioner has not shown that his Fourth Amendment claim was meritorious.

Because no constitutional violation occurred, Petitioner cannot demonstrate prejudice from counsel's failure to put forth evidence of such. The post-conviction court's rejection of these

claims was neither contrary to <u>Strickland</u> nor based upon an unreasonable determination of the facts.  These claims are denied pursuant to 28 U.S.C. § 2254(d).

### C.   Claims 3, 24, and 26

In Claim 3, Petitioner asserts that appellate counsel was ineffective for failing to file a motion to correct an improperly calculated sentencing guideline scoresheet that should not have included 120 victim injury points (Doc. 1 at 11).  Specifically, Petitioner asserts that appellate counsel should have filed a motion pursuant to Rule 3.800(b) of the Florida Rules of Criminal Procedure suggesting that the assessment of 80 victim injury points for penetration should not have been included on the scoresheet because penetration was not alleged in the information with respect to counts one and two (Ex. 13 at 5-6).  Petitioner further asserts that "the 40 victim injury sexual contact points had no factual basis to be assessed and were illegal under a long line of state and federal due process concerns." <u>Id.</u> at 8.  In Claim 24, Petitioner asserts that trial counsel was ineffective for failing to raise this claim to the trial court (Doc. 1 at 43).  Finally, in Claim 26, Petitioner asserts that the sentencing court erred by erroneously including 80 points for penetration in the sentencing scoresheet. <u>Id.</u> at 46.

In support of his first assertion, Petitioner cites Florida's Second District Court of Appeal in Rogers v. State, 963 So. 2d 328 (Fla. 2d DCA 2007), arguing that "the 80 penetration points were improperly assessed.  This is especially true in this case for at least three reasons: (1) 'Penetration' or 'Union' was not first alleged in the information; (2) 'Penetration' or 'Union' are essential elements to a violation of section 794.011(8)(b); and (3) The record indicates that the overall state prison sentence probably would have been less, but for the scoring of those 80 victim injury penetration points." (Ex. 13- at 6-7).

Petitioner raised Claim 3 in his state habeas petition where it was denied without comment by Florida's Second District Court of Appeal.  Claims 24 and 26 were denied by the post-conviction court with a specific finding that:

> [B]ecause the information can be read to allege penetration in the alternative and the jury made a factual finding as to penetration in Count 1, the points for penetration were properly scored.

(Ex. 20 at 35, 38).  Upon review of the record, the Court agrees that there is no merit in Petitioner's allegations.

In counts one and two of the amended information, Petitioner was identically charged as follows:

> Between March 01, 2003 and November 30, 2003 in Lee County, Florida, [Petitioner] did unlawfully engage in sexual activity with T.O., a child twelve years of age or older,

> but less than eighteen years of age, and at
> the time of such sexual activity, said
> defendant was in a position of familial or
> custodial authority to said child, contrary to
> Florida Statute 794.011(8)(b)

(Ex. 1). Petitioner was found guilty of count one with a specific

finding of sexual penetration and guilty of count two without a

finding of sexual penetration (T. at 618). In Rogers v. State,

Florida's Second DCA set out and explained the basis for assessing

victim injury points as follows:

> Section 921.0021(7), Florida Statutes (2003),
> provides the definition of victim injury that
> governs the assessment of victim injury points
> on Criminal Punishment Code score sheets. See
> also Fla. R. Crim. P. 3.704(d)(9). The statute
> sets forth the basic definition of victim
> injury as "the physical injury or death
> suffered by a person as a *direct result* of the
> primary offense, or any additional offense,
> for which an offender is convicted and which
> is pending before the court for sentencing at
> the time of the primary offense." §
> 921.0021(7)(a) (emphasis added).
>
> The statute contains additional provisions
> with respect to offenses "involving sexual
> contact." § 921.0021(7)(b). In pertinent part,
> the statute provides that where "the
> conviction is for *an offense involving sexual*
> *contact that includes sexual penetration*, the
> sexual penetration must be scored in
> accordance with the sentence points provided
> under s. 921.0024 for sexual penetration,
> regardless of whether there is evidence of any
> physical injury." § 921.0021(7)(b)(1)
> (emphasis added). (The Criminal Punishment
> Code worksheet set forth in section
> 921.0024(1)(a) provides 80 sentence points for
> sexual penetration.)

> **Under these statutory provisions, the assessment of penetration points is not limited to circumstances where penetration was an element specifically charged in the information. An offense can be one "involving sexual contact that includes sexual penetration" regardless of whether penetration was an element of the offense alleged in the information. § 921.0021(7)(b)(1).**
>
> The specific provisions of the statute relating to offenses "involving sexual contact that includes sexual penetration" must be read in the context of the basic definitional provision which permits the assessment of points for victim injury suffered "as a direct result" of an offense for which the defendant is convicted. The use of the words "involving" and "as a direct result" in the pertinent statutory provisions indicates that an injury or act of sexual penetration is a basis for the assessment of victim injury points whenever the injury or act of sexual penetration takes place in the course of or in connection with the commission of the offense for which the defendant is convicted. <u>See Geary v. State</u>, 675 So.2d 625, 626 (Fla. 2d DCA 1996) (recognizing that the assessment of victim injury points depends on "whether the victim's injury was a direct result of the defendant's crimes").

<u>Rogers</u>, 963 So. 2d at 331 (emphasis in bold added).  Accordingly, pursuant to <u>Rogers</u>, penetration points can be added to a sentencing scoresheet, even if penetration was not alleged in the information.

Petitioner was charged with sexual battery under Florida Statue § 794.011(8)(b).[7]  A conviction under § 794.011(8)(b) is

---

[7] This section provides in pertinent part that "[w]ithout regard to the willingness or consent of the victim, which is not

for an offense involving sexual contact that includes sexual penetration, and the trial court did not err by assessing 80 scoresheet points upon the jury's finding that penetration occurred. To the contrary, under § 921.0021(7)(b)(1), the court was required to do so. Appellate counsel was not ineffective for failing to file a meritless Rule 3.800(b)(2) motion based upon the improper assessment of 80 scoresheet points for penetration. Brownlee v. Haley, 306 F.3d 1043, 1066 (11th Cir. 2002) (counsel was not ineffective for failing to raise issues clearly lacking in merit).

Equally unavailing is Petitioner's argument that he was improperly assessed 40 scoresheet points on the basis of "sexual contact" with T.O. Florida Statute § 921.0021(7)(b) states that if a "conviction is for an offense involving sexual contact that does not include sexual penetration, the sexual contact must be scored in accordance with the sentence points provided under s

---

a defense to prosecution under this subsection, a person who is in a position of familial or custodial authority to a person less than 18 years of age and who . . . [e]ngages in any act with that person while the person is 12 years of age or older but younger than 18 years of age which constitutes sexual battery under paragraph (1)(h) commits a felony of the first degree[.]" Fla. Stat. § 794.011(8)(b).

Under subsection 1(h), sexual battery is defined in pertinent part as "oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object[.]" Fla. Stat. § 794.011(1)(h).

921.0024 for sexual contact, regardless of whether there is evidence of any physical injury." Id. Florida Statute § 921.0024 provides for forty sentence points for "sexual contact." In count two, Petitioner was convicted for sexual battery under § 794.011(8)(b) without a specific finding of penetration. Accordingly, forty sexual contact points were properly scored and appellate counsel was not ineffective for failing to file a Rule 3.800(b)(2) motion based upon the court's assessment thereof.[8]

---

[8] Petitioner also attempts to assert a claim pursuant to Apprendi v. New Jersey, 530 U.S. 466 (2000) and Blakely v. Washington, 542 U.S. 296 (2004) because the jury failed to make a specific finding of sexual contact (Ex. 13 at 8). However, the jury found Petitioner guilty of "oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object" under Florida Statute § 794.011(1)(h). Accordingly, the jury found Petitioner guilty of sexual contact with T.O.; otherwise it could not have convicted him of sexual battery under § 794.011(1)(h). Accordingly, the trial court appropriately assessed 40 victim injury points based on sexual contact.

Moreover, the assessment of 40 points for sexual contact did not increase Petitioner's sentence beyond the statutory maximum sentence of 90 years in prison. Accordingly, any argument based on Blakely and Apprendi is without merit. See Knarich v. State, 866 So. 2d 165, 171-72 (Fla. 2d DCA 2004) (recognizing that an Apprendi issue becomes moot if, upon resentencing, a defendant does not receive a sentence in excess of the statutory maximum); Bennett v. State, 971 So. 2d 196 (Fla. 1st DCA 2007) (rejecting appellant's Apprendi-based argument that 40 victim injury points were improperly assessed because "sexual contact" had not been specifically found by a jury because appellant had not been sentenced in excess of the statutory maximum); Daniels v. State, 929 So. 2d 710 (Fla. 1st DCA 2006) (no Apprendi violation when the 40 additional victim injury points did not cause the defendant's sentence to exceed the prescribed statutory maximum as calculated under a corrected scoresheet).

Petitioner has not shown that the sentencing court erred by scoring points for penetration or sexual contact. Moreover, neither of the issues raised in Claims 3, 24, or 26 indicate that trial or appellate counsel were constitutionally ineffective under Strickland. The claims are denied pursuant to 28 U.S.C. § 2254(d).

### D.    Claim 4

Petitioner asserts that appellate counsel was ineffective for failing to argue that the guilty verdicts on counts one and two were invalid as a matter of law because the state never proved that the victim in this case was between the ages of twelve and eighteen when the sexual battery occurred (Doc. 1 at 13; Ex. 13 at 12-15).

This claim is without record support. The information alleged that Petitioner committed two counts of sexual battery against T.O. between March 1, 2003 and November 30, 2003 (Ex. 1). At trial, T.O. testified that she turned fifteen years old in February of 2003 (T. at 333). She testified that Petitioner began his sexual activities with her in March of 2003 and continued through November of 2003. Id. at 336.

Given that there was evidence presented at trial of T.O.'s age at the time of the sexual battery, this Court cannot conclude that no reasonable appellate counsel would have failed to raise

this claim on direct appeal.  The state court's rejection of this claim was neither contrary to <u>Strickland</u> nor based upon an unreasonable determination of the facts.  Claim 4 is denied pursuant to 28 U.S.C. § 2254(d).

### E.   Claims 5 and 23

In Claim 5, Petitioner asserts that appellate counsel was ineffective for failing to argue that his case should be remanded for resentencing because the state trial court mistakenly believed it did not have discretion to downwardly depart from the sentencing guidelines (Doc. 1 at 14).  Petitioner asserts that "[t]he record demonstrates on its face that the sentencing court wanted to impose a lower sentence, but believed 'under the law' at least that he could not."  Petitioner argues that the trial court could have imposed a below-guidelines sentence because T.O. was a "willing participant" in the sexual battery.  In Claim 23, Petitioner asserts that trial counsel was ineffective for failing to argue for a downward departure based upon T.O.'s consent (Doc. 1 at 42). Petitioner raised Claim 5 in his state habeas petition where it was rejected by Florida's Second District Court of Appeal. Petitioner raised Claim 23 in his first Rule 3.850 motion where it was rejected by both the post-conviction court and Florida's Second District Court of Appeal (Ex. 20; Ex. 21).

The record does not support either of these claims.  During sentencing, Petitioner's attorney asked the court to impose a suspended sentence.  The court stated:

> Alright. I don't believe a suspended sentence can be imposed without an explanation of deviation from the guidelines, and I don't believe there is anything here that would, under the law at least, justify deviation from the guidelines, so I'm not inclined to do that.
>
> [S]ome offenses are so damaging to victims and detrimental to society that leniency is just – it's – it's very limited in what a court can do.  This is one of those cases where a young person is involved with sex with somebody in a familial authority.  It's just one of those cases in which there is very little room for leniency.

(Ex. 8 at 400-01).  The court sentenced Petitioner to 17 years in prison on the sexual battery counts and to a consecutive term of five years on counts three and four for promoting sexual performance by a child. Id. at 401.

The trial court was correct that under the applicable Florida law, it could not have imposed a suspended sentence without accompanying the departure with a "written statement delineating the reasons for the departure." See Florida Statute § 921.0016(1)(c) (2003)("A state prison sentence which varies upward or downward from the recommended guidelines prison sentence by more than 25 percent is a departure sentence and must be accompanied by a written statement delineating the reasons for the

departure, filed within 7 days after the date of sentencing[.]"). Moreover, although Petitioner asserts that the court "wanted" to sentence him to a sentence below the guidelines (Ex. 13 at 16), this assertion is belied by the fact that the court imposed a sentence *above* the statutory minimum sentence of 199.6 months in prison (Ex. 9). Absent supporting evidence in the record, a court cannot consider a petitioner's self-serving assertions to be of probative value. See Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (recognizing that a petitioner is not entitled to habeas relief "when his claims are merely 'conclusory allegations unsupported by specifics' or 'contentions that in the face of the record are wholly incredible'" (citation omitted)).

Equally unavailing is Petitioner's unsupported assertion that he was entitled to a downward departure due to T.O.'s "willing participation" in the sexual activity (Ex. 13 at 16-17). To the contrary, T.O. testified at trial that she only engaged in sexual activity with Petitioner because he threatened to tell her mother that T.O. had watched pornography if she did not comply (T. at 336). He tried to force her to perform oral sex on him, but she refused to do so. Id. at 341-42. Petitioner inserted his fingers inside her vagina on several occasions, and even though she told him not to, he continued to do so. Id. at 343. She testified that "at first, he made me [engage in sexual activity with him].

And then he started saying I'll buy you this or I'll buy you that, which he never did. And then he started saying that you can drive the Yukon he had at the time." Id. at 344. She was not aware that Petitioner videotaped their sexual encounters. Id. at 345. After Petitioner made the first videotape, he threatened to show the tape to her family and her friends if she did not continue to engage in sexual activity with him. Id. She testified that at first, she tried to push Petitioner away, but she eventually got used to it "because [she] didn't really have a choice." Id. at 348.

Based on the record, it is clear that reasonable appellate counsel could have declined to argue on direct appeal that Petitioner's case should have been remanded for resentencing. Further, trial counsel was not ineffective for failing to raise a meritless claim during Petitioner's sentencing hearing. Claims 5 and 23 are denied pursuant to 28 U.S.C. § 2254(d).

### F.  Claim 6

Petitioner asserts that appellate counsel was ineffective for failing to argue in a motion for resentencing that the trial court erroneously assessed 80 sentencing points for penetration "since [T.O.] emphatically denied that any penetration had ever occurred and the prosecution failed to prove otherwise." (Doc. 1 at 16).

Petitioner directs the Court to a portion of T.O.'s cross examination in which his defense counsel asked T.O. to explain why she had told the investigating detective that Petitioner had not put his finger inside of her:

> T.O.:     Well, my, I believe that when you finger somebody that your whole finger was inside a girl's vagina and it was not that.
>
> COUNSEL:  And [the detective] explained to you that — while you were off the record — that just by touching inside your lips of your labia that would be enough.  Is that correct?
>
> A.        That would be called "fingering"?
>
> Q.        Yes.
>
> A.        No, that's not fingering.
>
> Q.        Well, what is fingering?
>
> A.        When you put your finger inside a girl's vagina.
>
> Q.        And a "vagina" to you is?
>
> A.        What?
>
> Q.        What is a vagina?
>
> A.        A vagina is the girl part of the girl.
>
> Q.        Can [you] describe he parts that we're talking about?
>
> A.        He put his hands on my clit, if you want to say, and he constantly put things on my vagina.  But he never actually stuck them in.  He tried to at one time, but I know he didn't because it hurt, and I pushed him

> away from me constantly.  And he
> never actually penetrated anything
> inside of me.

> Q.         And that's because you were a
>            virgin?

> A.         Yes.

(T. at 397-98).  On re-direct examination, T.O. testified that Petitioner's fingers would hurt her vagina "a lot" and "[his fingers] would go in "[m]aybe a half of an inch or something" and "[a]s soon as I felt it and it hurt really bad, I would kick him out." Id. at 414.  The jury specifically found on count one that penetration had occurred. Id. at 618.

Given T.O.'s testimony that Petitioner's fingers had penetrated her vagina, albeit by only half an inch, this Court concludes that a reasonable appellate attorney could have failed to file a motion for resentencing on the basis that Petitioner was improperly assessed points for penetration. Florida courts have recognized that even slight penetration is sufficient to show that penetration occurred. See Ready v. State, 636 So. 2d 67, 67 (Fla. 2d DCA 1994) ("[E]ven the slightest evidence of penetration is sufficient [to show that penetration occurred]"); J.W.C. v. State, 573 So. 2d 1064, 1964 (Fla. 5th DCA 1991)(" Where the battery involves the use of a defendant's finger, the state must show penetration, although even the slightest evidence of penetration is sufficient."); Pride v. State, 511 So. 2d 1068, 1170 (Fla. 1st

DCA 1987)("any penetration, no matter how slight, constitutes a completed sexual battery."); Richards v. State, 738 So.2d 415, 418 (Fla. 2d DCA 1999)("Union permits a conviction based on contact with the relevant portion of anatomy, whereas penetration requires some entry into the relevant part, however slight.").

T.O. also testified that Petitioner performed oral sex on her "about six or seven times," some instances of which were videotaped (T. at 341, 342, 352, 414). A portion of one of the videotapes was played to the jury in showing that Petitioner had his tongue on T.O.'s vagina and that it was hurting her and it was going "too far down." Id. at 430. Fellatio has been recognized as "penetration" by Florida courts, and there is no dispute that fellatio, completed or not, constitutes "union with" a sexual organ. See Dickinson v. State, 693 So. 2d 55 (Fla. 5th DCA 1997) (concluding that fellatio is penetration and upheld the assessment of penetration points where the defendant performed fellatio on the victim as well as where the victim performed fellatio on the defendant); Lowman v. State, 720 So. 2d 1105 (Fla. 2d DCA 1998) (evidence of a completed act of fellatio is sufficient to require points for penetration).

The state court's denial of this claim was not contrary to Strickland or based upon an unreasonable determination of the facts, and Claim 6 is denied pursuant to 28 U.S.C. § 2254(d).

### G.   Claim 7

Petitioner asserts that fundamental error occurred when appellate counsel failed "to raise the state trial court's erroneous jury instruction on section 794.011(1)(h) since it failed to clarify that a finger is an object requiring proof of penetration." (Doc. 1 at 17).  Petitioner raised this claim in his state habeas petition, and it was denied by Florida's Second District Court of Appeal (Ex. 21).

It is unclear to the Court the portion of the jury instruction to which Petitioner objects or why he believes he is entitled to habeas relief on this claim.  During the jury charge, the trial court instructed the jury as to the three elements charged in counts one and two:

> To prove the crime of Sexual Battery Upon a Child by a Person in a Familial or Custodial Authority as charged in counts 1 and 2, the State must prove the following three elements beyond a reasonable doubt:
>
> 1.   [T.O.] was twelve years of age or older but less than 18 years of age.
>
> 2.   Patrick O'Leary stood in the position of familial or custodial authority with regard to [T.O.]
>
> 3.   Patrick O'Leary committed an act upon T.O. in which the sexual organ of Patrick O'Leary penetrated or had union with the vagina of [T.O.] or the sexual organ of [T.O.] had union with the mouth of Patrick O'Leary or the vagina of [T.O.] was penetrated by an object.

. . .

- 43 -

> The punishment provided by the law for the crime of Sexual Battery Upon a Child by a Person in a Familial or Custodial Authority is greater if during the commission of the Sexual Battery Upon a Child by a Person in a Familial or Custodial Authority the defendant sexually penetrated the victim.  Therefore, if you find the defendant guilty of Sexual Battery Upon a Child by a Person in a Familial or Custodial Authority, you must then consider whether the State has further proved this aggravating circumstance and reflect this in your verdict.
>
> "Sexual penetration" is defined as entry into the sexual organs of the victim or entry of the sexual organ of the defendant into the victim, however slight.

(T. at 598-600).  This is the standard Florida jury instruction for a crime under Florida Statute § 794.011(8)(b). See Fla. Pattern Jury Inst. Crim. 11.6.  Petitioner appears to now argue that the Court should have specifically clarified that a finger is an "object" that could be used for penetration. Petitioner further seems to complain that since there was no evidence of penetration, the trial court erred by reading the penetration instruction at all (Ex. 13 at 22-23).

Although Petitioner fails to direct the Court to any case law in support of this claim, Florida courts have noted that a conviction for sexual battery requires "either penetration by or union with a sexual organ or penetration by an object.  The statute is not violated by proof of union with an object in the absence of penetration." Gill v. State, 586 So. 2d 471, 472 (Fla. 4th DCA

1991).  To the extent that Petitioner now complains that the only evidence at trial was that his fingers had "union with" T.O.'s vagina (thus not justifying a conviction for sexual battery under Gill), the claim is refuted by the record.

Evidence that Petitioner penetrated T.O.'s vagina with an object (his finger) and also that Petitioner performed oral sex on T.O. was presented at trial through T.O.'s testimony and through videotaped evidence. See discussion supra Claim 6.

Based on the record, the Court concludes that a reasonable appellate attorney could have failed to argue that fundamental error occurred as a result of the jury instructions read during the trial court's charge to the jury.  The state court's rejection of this claim was not contrary to Strickland or based upon an unreasonable determination of the facts, and Claim 7 is denied pursuant to 28 U.S.C. § 2254(d).

**H.   Claim 10**

Petitioner asserts that trial counsel was ineffective for failing to move for suppression of the videotapes based on the fact that the police viewed them without a search warrant (Doc. 1 at 22).  Petitioner raised this claim in his Rule 3.850 motion, and it was denied as follows:

> [Petitioner] asserts that his counsel was
> ineffective for failing to move to suppress
> "both videotapes based on them being viewed by
> deputies without a search warrant."   He

contends that "[n]otwithstanding the way the tapes were illegally obtained, once they were turned over to the authorities they should not have been watched or viewed without first obtaining search warrants." In support of his claim, Defendant cites to Walter v. U.S., 447 U.S. 649 (1980), where the United States Supreme Court held that Fourth Amendment protections apply to governmental searches performed subsequent to private searches when the government's inquiry is more intrusive or extensive than the private search.

Unlike in Walter, the private citizen, Lisa Olsson, who seized the first of the two videotapes did in fact watch the tape prior to handing [it] over to law enforcement officers. Thus the subsequent viewing of the tape by the police was not a violation of Defendant's Fourth Amendment right, because [the] viewing was not more intrusive or extensive than the private search. However, the private citizen, Kurt Thornton, who recovered the second videotape, testified he first wanted that tape along with law enforcement officers. Mr. Thornton's seizure of the tape was not illegal however, because, as noted above in Claim B *supra*, the Defendant gave him permission to enter the home and retrieve the videotape. A defendant "assumes the risk that his confidant will reveal that information to the authorities, and if that occurs, the Fourth Amendment does not prohibit governmental use of that information." U.S. v. Jacobsen, at 117. By granting Mr. Thornton permission to retrieve the videotape, the Defendant assumed the risk that Mr. Thornton may turn it over to the police, which he in fact did; therefore, the Fourth Amendment does not require the officers in the case at bar to get a search warrant prior to viewing the second videotape. Defense counsel cannot be found ineffective for failing to file a motion that would not have succeeded. Kormondy v. State, 983 So. 2d 418 (Fla. 2007). Defendant

> has failed to prove either ineffective
> assistance or prejudice[.]

(Ex. 20 at 9-10) (internal citations to the record omitted).

Florida's Second District Court of Appeal *per curiam* affirmed the post-conviction court's adjudication of this claim (Ex. 21).

As discussed above, *the* Constitution does not apply to searches, reasonable or otherwise, by private individuals, so long as the private party is "'not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" Jacobsen, 466 U.S. at 113 (1984) (quoting Walter, 447 U.S. at 662 (Blackmun, J., dissenting)). Further, to be a Fourth Amendment search, a governmental intrusion must infringe on a legitimate expectation of privacy. Id.  Because a private search frustrates such an expectation, an ensuing police intrusion that stays within the limits of the private search is not a search for Fourth Amendment purposes. Id. at 117-18, 120.  Thus, in a private search case, the legality of later governmental intrusions "must be tested by the degree to which they exceeded the scope of the private search." Id. at 115.

In Walter, a package was delivered to a private company. Employees opened the package, and found individual boxes inside. The outside markings on the interior boxes raised suspicions that illegal pornographic movies would be found inside.  Thinking the package looked suspicious, an employee contacted law enforcement.

Agents confiscated the boxes, and, without first obtaining a warrant, viewed one of the movies on a projector in order to ascertain its contents. The United States Supreme Court determined that viewing the films constituted a "search" that violated the Defendant's reasonable expectation of privacy. The turning point in that case was the fact that "the agents' reason for viewing the films was to determine whether their owner was guilty of a federal offense". Walter, 447 U.S. at 654.

Both Layton and Olsson testified that they viewed the first videotape prior to giving it to the police (Ex. 3 at 78-79). Unlike the viewing of the film in Walter, the police viewing of the first videotape was not an expansion of this search; the police did not have to do any "further investigation" of the videotape "in order to obtain evidence which would be used at trial." Walter, 447 U.S. at 654. Thus, no Fourth Amendment search occurred regarding the first videotape, and the "search" of this tape was lawful.

Likewise, the post-conviction court reasonably concluded that Petitioner granted permission to Thornton to retrieve the second videotape. Thornton testified to such at the evidentiary hearing and at trial. By doing so, Petitioner assumed the risk that Thornton would turn the second videotape over to the police. Accordingly, the Fourth Amendment was not implicated by the

police's warrantless search of the second videotape. See Jacobsen, 466 U.S. at 117 ("It is well-settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information. Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now-nonprivate information[.]"); United States v. Miller, 425 U.S. 435 (1976) ("[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.").

Given the factual evidence set forth at the evidentiary hearing on Petitioner's motion to suppress and at trail, this Court concludes that reasonable counsel could have failed to move for suppression of the videotapes based on the fact that the police viewed them without a search warrant. The post-conviction court's rejection of this claim was neither contrary to Strickland nor based upon an unreasonable determination of the facts. Claim 10 is denied pursuant to 28 U.S.C. § 2254(d).

**I.   Claims 11, 13, and 36**

In Claim 11, Petitioner asserts that trial counsel was ineffective for failing to request a continuance to "adequately prepare" for Petitioner's trial (Doc. 1 at 23).  In Claim 13 Petitioner asserts that trial counsel was ineffective for admitting "in open court that she was unprepared" for Petitioner's trial. Id. at 27.  In Claim 36, Petitioner repeats his argument that trial counsel was ineffective for failing to timely file a motion for continuance. Id. at 62.

Petitioner raised these claims in his Rule 3.850 motion, and the post-conviction court denied the claims, noting that counsel had indeed asked for a continuance at trial which was denied by the trial court (Ex. 20 at 10).  The post-conviction court further noted that Petitioner had been represented by multiple attorneys, the last of which he had dismissed, and that he could not show prejudice from counsel's motion for a continuance. Id. at 14-15.

As noted by the post-conviction court, Claims 11 and 36 are refuted by the record.  Counsel moved for a continuance prior to trial (T at 27).  Petitioner subsequently made another *pro se* motion for a continuance. Id. at 31.  Both were denied by the trial court because the court was "satisfied that the matter is such that it needs to go to trial, it can be fairly tried, it can be fairly tried by this prosecutor and this defense attorney, it can be fairly tried at this time, so I'm not sure if that's an

additional request for continuance or exactly what it is.  I'm going to deny it." Id. at 33.  Accordingly, these claims fail to satisfy Strickland's performance prong.

These claims also fail to satisfy Strickland's prejudice prong.  Although Petitioner generally avers that "[p]roper presentation [of a motion for continuance] would have resulted in a different outcome at trial" (Ex. 15 at 7), he does not further address how he suffered prejudice from counsel's failure to make a "proper" motion for continuance.  Moreover, upon review of the record, including the magnitude of the evidence against Petitioner, this Court cannot conclude that Petitioner suffered prejudice from counsel's alleged failure to make a proper, or more substantial motion for continuance or from the trial court's denial of the motion that was made.

The post-conviction court did not unreasonably conclude that the allegations set forth in Claims 11, 13, and 36 fail to satisfy either Strickland prong, and these claims are denied pursuant to 28 U.S.C. § 2254(d).

### J.   Claim 12

Petitioner asserts that trial counsel was ineffective for failing to adequately investigate and present evidence showing that the videotapes presented at trial had been tampered with (Doc. 1 at 25). In his Rule 3.850 motion, Petitioner asserted that "it

was obvious to [Petitioner] that [the videotapes] had been cut and spliced in such a way as to make him appear to be more aggressive and depraved." (Ex. 15 at 8-9). Petitioner raised this claim in his Rule 3.850 motion, and the post-conviction court denied the claim because counsel had filed a motion to suppress the videotapes on the ground that they had been altered.[9] The post-conviction court also conclude that Petitioner had failed to demonstrate prejudice (Ex. 20 at 7-8). Florida's Second DCA *per curiam* affirmed (Ex. 21).

The record supports the state court's denial of this claim. Petitioner's assertion that the videotapes were somehow spliced to make him look "more aggressive and depraved" is factually unsupported. Petitioner has offered no evidence that the tapes were, in fact, tampered with. Petitioner's speculation that the tapes may have somehow been spliced in such a way to make his sexual activity with T.O. appear worse than it actually was is insufficient to meet his burden of proof. Therefore, Petitioner has not made the requisite factual showing, and his self-serving speculations regarding this claim will not sustain a claim of ineffective assistance of counsel. <u>Aldrich v. Wainwright</u>, 777 F.2d

---

[9] The motion was actually for the appointment of an expert to examine the tapes because "Defendant believes and alleges the two video tapes were recorded by different cameras" and that "Defendant believes someone may have tampered with the cameras." (Ex. 4).

630, 636 (11th Cir. 1985) (speculation insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation); Johnson v. Alabama, 256 F.3d 1156 (11th Cir. 2001) (mere speculation that missing witnesses would have been helpful is insufficient to meet a petitioner's burden of proof).

Petitioner has not demonstrated that the post-conviction court's adjudication of this claim was contrary to Strickland or was based upon an unreasonable determination of the facts. Claim 12 does not warrant federal habeas relief.

### K.   Claim 14

Petitioner asserts that counsel was ineffective for mistakenly requesting additional jurors and requesting that the trial court advise the jurors about the potential penalties Petitioner faced if convicted at trial (Doc. 1 at 28). Petitioner raised this claim in his Rule 3.850 motion, asserting that defense counsel erred by filing a pre-trial motion in limine that argued for "the right to discuss penalty and sentencing in 'capital cases.' Defendant's case involved NO capital cases, as his victim was at least fifteen years old at the time of the alleged crimes." (Ex. 15 at 9). Petitioner concedes that "no specific prejudice resulted from this error[.]" Id. at 10.

Because there was no resulting prejudice from counsel's alleged error, Petitioner has not satisfied Strickland, and he is not entitled to federal habeas relief on Claim 14.

**L.    Claim 15**

Petitioner asserts that trial counsel was ineffective for failing to present evidence of Petitioner's lack of custody or control over T.O. (Doc. 1 at 30).  In his Rule 3.850 motion, Petitioner argued that Lisa Olsson, the victim's mother, had lied at trial regarding the extent of Petitioner's control over T.O. and that if counsel had contacted T.O.'s father and presented his testimony at trial, "he would have truthfully testified that [Petitioner] had absolutely NO custody or authority over T.O." (Ex. 15 at 11). The post-conviction court denied the claim as legally insufficient because Petitioner had failed to allege that T.O.'s father, Robert Olsson, was available to testify at trial. The Court then concluded that, even had the claim been sufficiently pleaded, Petitioner could not demonstrate prejudice:

> The calling of Mr. [Olsson] as a witness would
> have merely [been] cumulative to other
> evidence and arguments already presented, and
> counsel cannot be found ineffective for
> failing to present merely cumulative evidence.
> See Cole supra.  The record is replete with
> examples of trial counsel arguing that
> Defendant had neither control nor custody over
> the victim.   For example, defense counsel
> moved for a judgment of acquittal, which
> included arguments that the State had failed
> to prove custody or control by the Defendant

over the victim. In cross examining Todd
Layton, counsel tries to elicit testimony and
make arguments that demonstrate a lack of
familial or custodial control. Likewise, in
cross examining Lisa Olsson, the mother of the
victim and former girlfriend of the Defendant,
counsel strenuously cross-examined the
witness and made similar arguments on the
issue of whether the Defendant had a custodial
or familial relationship with the victim.
Also in cross examining Kurt Thornton, the
victim, and Trever O'Leary, counsel attempted
to elicit testimony of a lack of familial
relationship with the victim.

Furthermore, in light of the testimony of Todd
Layton (a best friend of the Defendant at the
time of the event), Lisa Olsson, Kurt
Thornton, the victim, Trever O'Leary (the son
of the Defendant and Lisa Olsson), and Amy
Watts, all of whom testified that the
Defendant lived with Lisa and the victim for
a period of time and that he demonstrated
parental control and oversight over the
victim, substantial evidence was presented to
demonstrate that the Defendant did indeed have
a familial and custodial control over the
victim. For these reasons, Defendant has
failed to establish prejudice, because no
reasonable probability exists that the outcome
of the trial would have been different had
counsel gotten the requested records and
witness Defendant alleges in his motion.

(Ex. 20 at 18-19) (internal citation to the record omitted). The
post-conviction court's denial of this claim was affirmed by
Florida's Second District Court of Appeal (Ex. 21).

Habeas courts generally view ineffective assistance claims
with great caution when the only evidence of a missing witness'
testimony comes from the petitioner. See Schwander v. Blackburn,

750 F.2d 494, 500 (5th Cir. 1985). "[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." United States v. Ashimi, 932 F.2d 643, 650 (7th Cir. 1991) (footnotes omitted); Streeter v. United States, 335 F. App'x 859, 864 (11th Cir. 2009) ("[M]ere speculation that missing witnesses would have been helpful is insufficient to meet the petitioner's burden of proof.") (citing Johnson, 256 F.3d at 1187). Petitioner has not presented actual testimony or an affidavit from Robert Olsson indicating the nature of his testimony.

Further, even assuming that Robert Olsson's testimony would have been helpful and that counsel's performance fell below an objective standard of reasonableness by not calling him, Petitioner cannot show that Robert Olsson's testimony would have likely changed the result of the trial. Numerous witnesses for the state testified that Petitioner lived with T.O.'s mother for an extended period of time and that he demonstrated parental control and oversight over T.O. Todd Layton testified that T.O. treated Petitioner as a father and that he was "the only father she really knows (T. at 14, 56). Lisa Olsson testified that she and Petitioner had raised T.O. and that T.O. didn't have a

relationship with her biological father. Id. at 69.  Kurt Thornton testified that Petitioner and T.O. had a "father and daughter" relationship.  Id. at 224.  T.O. testified that she lived with Petitioner from the age of four until fifteen and that he took on the role of her father.  Id. at 332.  T.O. thought of Petitioner as her step-father.  Id. at 393.  Indeed, in one of the videotapes of the sexual activity between T.O. and Petitioner, T.O. told Petitioner, "I'm scared still because you're my step-dad. What's a worse thing?" Id. at 428-29.

Petitioner has not demonstrated that the state court's adjudication of this claim was contrary to Strickland or was based upon an unreasonable determination of the facts.  As a result, Claim 15 is denied pursuant to 28 U.S.C. § 2254(d).

**M.   Claims 16 and 34**

In Claim 16 Petitioner asserts that trial counsel was ineffective for failing to present proof that there was no scarring or evidence of penetration of T.O.'s vagina (Doc. 1 at 31).  In Claim 34, Petitioner asserts that trial counsel was ineffective for failing to call Nurse Susan Sherman as a witness to testify that there was no scarring or evidence of penetration of T.O.'s vagina. Id. at 59.

In denying this issue, the post-conviction court recognized that Lisa Olsson had testified at trial that from what she

remembered, there was scar tissue present on T.O.'s vagina, but she was not sure (Ex. 20 at 19). However, the victim had testified that no penetration had occurred. Id. The post-conviction court noted that T.O. did testify that Petitioner had placed his finger in her vagina and that the testimony "therefore, demonstrates slight penetration." Id. at 20. The post-conviction court further noted:

> Contrary to what Defendant claims though, the conflicting testimony of the witnesses was not the only evidence presented at trial to establish penetration. The videotapes were placed into evidence and a portion of the tapes were played during the trial. A review of the transcript of the tape shows that Defendant had his tongue on the victim's vagina, and that it was hurting her and it was going "too far down." The fact that scarring did not occur is not dispositive of whether or not penetration had occurred, as there need only be evidence of the slightest penetration, and the videotape evidence coupled with the victim's testimony demonstrates at least slight vaginal penetration. Furthermore, defense counsel had already elicited testimony from the victim that there was no scar tissue, so the placing into evidence of the medical report or the nurse's testimony would have been cumulative evidence. As noted above, counsel cannot be found ineffective for failing to present merely cumulative evidence.
>
> Finally, both the videotapes and the victim's testimony demonstrate that the Defendant performed fellatio on the victim. Based on the above reasoning, no reasonable probability exists that the outcome of the trial would have been different had counsel either called the nurse to testify or entered into evidence the medical report, because there was

> substantial competent evidence presented to
> the jury to allow them to make a factual
> determination that penetration had occurred,
> therefore, Defendant has failed to demonstrate
> prejudice, and Claim M is without merit.

(Ex. 20 at 22-23) (internal citations to the record omitted).

Florida's Second District Court of Appeal *per curiam* affirmed (Ex. 21).

As discussed in Claims 6 and 7, ample evidence was presented at trial that penetration had occurred. See discussion supra Part III(F)-(G). Moreover, Florida Statute § 794.011(1)(h) does not require that actual injury or scarring occur as a result of the penetration. This Court concludes that no competent trial counsel could have decided against presenting additional evidence regarding Petitioner's penetration of T.O.'s vagina. Accordingly, Petitioner has not shown that the post-conviction court's denial of Claims 16 or 34 was contrary to Strickland or based upon an unreasonable determination of the facts. The claims are denied pursuant to 28 U.S.C. § 2254(d).

**N.   Claim 17**

Petitioner asserts that trial counsel was ineffective for failing to impeach Kurt Thornton about a fictitious telephone call from the county jail (Doc. 1 at 33). Specifically, Petitioner asserts that although Thornton testified that Petitioner called him and asked him to retrieve a videotape from his trailer, the

call logs show that "all six phone call[s] went uncompleted because the 'inmate hung up' during 'out dial.'" (Ex. 15 at 13). Therefore, argues Petitioner, "[t]he state's own documentary exhibit faultlessly impeaches Kurt's fabrication about a phone conversation from jail." Id.

The post-conviction court denied this claim on the ground that it was not supported by the record because the state's witness on this issue had not testified that all six phone calls that Petitioner made from jail were unanswered (Ex. 20 at 25). Rather, the post-conviction court concluded that the witness testified that *one* of the phone calls Petitioner made from jail was unanswered. Id. Florida's Second District Court of Appeal *per curiam* affirmed (Ex. 21).

Tamara Looper ("Looper"), an administrative assistant at the Lee County's Sheriff's Office, testified that Petitioner had made six telephone calls from the jail to a telephone number belonging to Thornton (T. at 226, 254-65). On cross-examination, trial counsel asked about a "zero" that was written next to a place that asks for a duration of time (T. at 266). Looper testified that "[i]t's saying zero because the call was not accepted." (T. at 266). As noted by the post-conviction court, Looper did not testify that all six calls were unaccepted as is now argued by Petitioner. Rather, she testified that <u>one</u> of the six calls made

to Thornton had not been accepted.[10]   Accordingly, because the Lee County Sheriff's phone log showed that five other calls were made to Thornton, the state court reasonably concluded that Looper's testimony provided no grounds for counsel to impeach Thornton on this issue.

The post-conviction court's rejection of this claim was neither contrary to Strickland nor based upon an unreasonable determination of the facts.   Claim 17 is denied pursuant to 28 U.S.C. § 2254(d).

   **O.   Claim 18**

Petitioner asserts that trial counsel was ineffective for failing to impeach Lisa Olsson "with her lies." (Doc. 1 at 34). In his Rule 3.850 motion, Petitioner points to a litany of inconsistencies in Olsson's testimony that he believes "caused the jury to accept her lies as truth and eliminated a fertile source of reasonable doubt." [11] (Ex. 15 at 14-15).   The post-conviction

---

   [10] This is consistent with Thornton's testimony that "then a few other times [Petitioner] had called during the day, which I did not pick up the phone." (T. at 228).

   [11] Specifically, Petitioner asserts that: "Lisa swore that [He] cut her phone lines and then left her house.   Yet the next morning she's miraculously driving defendant's  truck to work"; Olsson testified that she viewed only "a few seconds of the video" when the first several minutes shows Petitioner setting up the camera "before T.O. ever touched his penis."; Olsson claimed that Todd met Lisa after work to talk about the first videotape, yet Pilkington testified that Todd did not meet Olsson after work; Olsson testified that she made no phone calls after retrieving the

court denied this claim (Ex. 20 at 27-20).  The court noted that defense counsel extensively cross-examined Olsson on a number of issues and that "none of the alleged lies that Defendant lists in his motion would have prejudiced the Defendant in such a way as to create a reasonable probability that the outcome of the trial would have been different." Id.  Florida's Second District Court of Appeal *per curiam* affirmed (Ex. 21).

Other than speculate that, had counsel more rigorously cross-examined Olsson, there would have been reasonable doubt in the jury's mind as to Petitioner's guilt, Petitioner does not explain how the state court's denial of this claim was contrary to Strickland or based upon an unreasonable determination of the facts.  The issues that Petitioner raises are collateral matters that would not have affected the result of trial.  On the contrary, the issues are largely irrelevant to the elements of the sexual

---

first video, yet Pilkington said that they called the police after they left Petitioner's trailer; Olsson said she only spoke to a receptionist at the Sheriff's Office while Pilkington said she also spoke with a detective; Olsson said she waited for two hours at a gas station for the police, while Gianfrancesco said it was a much shorter period of time; Olsson gave conflicting testimony regarding when she phoned the police after Thornton retrieved the second videotape; Olsson said she didn't leave her children home alone while T.O. said that she did; Olsson testified that she had a lot of injunctions against Petitioner whereas she only had two; Olsson testified that she didn't talk to the police until after she retrieved the videotape from Petitioner's trailer, whereas Layton testified that she had called the police prior to retrieving the tape (Ex. 15 at 14-15).

battery charges against Petitioner, and counsel's performance was not deficient for failing to raise them. See Knowles, 556 U.S. at 111 (recognizing that the Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability or realistic chance for success). Counsel was not ineffective in handling these collateral matters, and Petitioner cannot demonstrate he was prejudiced by any of the alleged errors.

Petitioner has failed to show that the state court's adjudication of this claim was contrary to Strickland or based upon an unreasonable determination of the facts.  Claim 18 is denied pursuant to 28 U.S.C. § 2254(d).

### P.  Claim 19

Petitioner asserts that he was denied effective assistance of counsel because counsel did not object to leading questions at the evidentiary hearing on his motion to suppress (Doc. 1 t 36). Petitioner points to a portion of the hearing transcript in which the state is attempting to clarify whether Detective Gianfrancesco responded to a call for a violation of injunction or a sexual assault (Ex. 3 at 205):

> STATE:     Were there two – to the best of your
>            knowledge,    were    there    two
>            simultaneous  investigations  being
>            conducted at Lisa Olsson's house the
>            night when you received a copy of
>            the first videotape?
>
> A.         Yes.

> Q.          One for violation of the injunction
>             and one for sexual assault?
>
> A.          Yes, ma'am.

(Ex. 3 at 205).  Petitioner asserts that the suppression hearing was very important and "[h]ad the tapes (rightly) been suppressed, there would have been no prosecution or trial in this case[.]" (Ex. 15 at 15).

The post-conviction court denied this claim on the ground that "even if there were leading questions asked, the objections of such would not have changed the results of the suppression hearing." (Ex. 20 at 28).  The post-conviction court noted that the trial court had not been swayed by the factual issues presented by the defense and that "[t]he alleged leading questions to one of the witnesses on an issue as to who called him and what type of dispatch the officer responded to that day would have had no bearing on the outcome of the suppression hearing in light of the factual and testimonial evidence presented at the hearing." (Ex. 20 at 28-29).  Florida's Second District Court of Appeal *per curiam* affirmed (Ex. 21).

A review of the testimony reflects that the state asked Gianfrancesco some leading questions as to which defense counsel could have objected.  However, the questions were related to the foundational issue of why he was initially dispatched to Olsson's home, and an objection would not have benefited the defense.  It

had no bearing on whether the videotapes had been retrieved by Olsson and Thornton at the police's request. Even assuming deficient performance by counsel for failing to object to the prosecutor's leading question, Petitioner has not shown resulting prejudice. Therefore, Claim 19 is without merit and is denied pursuant to 28 U.S.C. § 2254(d).

### Q.   Claim 20

Petitioner asserts that trial counsel was ineffective for failing to allow Layton to answer a question after the trial court overruled the state's objection (Doc. 1 at 37). Specifically, Petitioner asserts that while cross-examining Todd Layton, the state objected to a question (Ex. 15 at 16). Subsequently, "[t]he court overruled that objection but counsel didn't let Todd answer her question, proceeding blithely along as if the objection had been sustained." Id.

The post-conviction court denied this claim as "clearly" refuted by the record because "the line of questioning which followed after the objection, while not the exact same form of the question asked before the objection, is substantially similar in substance and elicits the same information sought by counsel through the objected-to question." (Doc. 20 at 30). Florida's Second District Court of Appeal per curiam affirmed (Ex. 21).

The post-conviction court's adjudication of this claim was reasonable.  Layton testified that he had received a phone call from Thornton telling him that Petitioner had called from jail asking him (Thornton) to retrieve the second tape (T. at 50). Defense counsel questioned Layton about his conversation with Thornton and asked Layton what he said to Thornton. Id. at 51. The state objected to the question, but was overruled. Id.  Defense counsel then asked whether Layton had talked to Officer Gianfrancesco and whether he had subsequently given any information to Thornton. Id.

As noted by the post-conviction court, counsel did repeat the substance of his question to Layton, and Layton was allowed to answer.  Accordingly, Claim 20 lacks a factual basis in the record and is denied pursuant to 28 U.S.C. § 2254(d).

**R.   Claim 21**

Petitioner asserts that counsel was ineffective for failing to impeach Olsson as to the dates the videotapes were made (Doc. 1 at 39). Specifically, Petitioner states that Olsson testified that the tapes were made prior to August of 2003 because her bedroom furniture was present in the background (Ex. 15 at 16). However, T.O. testified that the tapes must have been made in October of 2003 because that was when the oral sex began. Id.  The post-conviction court denied this claim as follows:

> [D]espite what Defendant may believe, a
> difference in three months as to the date of
> the creation of the tapes does not rise to the
> level of prejudice contemplated under
> Strickland and does not create a reasonable
> probability that the outcome of the trial
> would have been different had counsel argued
> this discrepancy in dates.  Defendant was 15
> at the time of the taping in 2003, and was 18
> at the time of trial.  Whether before August
> of 2003 or on or after October of 2003, the
> victim would still have been under the age of
> 18 at the time of the videotaping, thus the
> discrepancy in the dates given by the witness
> and counsel's alleged failure to forcefully
> argue this point, cannot be deemed
> prejudicial.

(Ex. 20 at 31)(internal citations to the record omitted). Florida's

Second District Court of Appeal *per curiam* affirmed (Ex. 21).

Petitioner does not explain how he suffered prejudice from

this discrepancy between Olsson's and T.O.'s testimony.  T.O.

testified that her birthday was on January 15, 1988 (T. at 331).

Therefore, she was fifteen years old in March of 2003 and in

October of 2003.  Moreover, under Florida Statute § 794.011(8)(b),

the state needed only prove that T.O. was under the age of eighteen

when the tapes were made.  Given that the videotapes were retrieved

from Petitioner's trailer on or around March 6, 2004, it is

axiomatic that the videotapes were produced while T.O. was under

the age of eighteen.

The state court's conclusion that Petitioner cannot show

prejudice from counsel's failure to impeach Olsson or T.O. on this

issue was neither contrary to Strickland nor based upon an unreasonable determination of the facts, and Claim 21 is denied pursuant to 28 U.S.C. § 2254(d).

   **S.   Claim 22**

   Petitioner asserts that counsel was ineffective for failing to impeach Thornton about viewing the videotape in Petitioner's home (Doc. 1 at 40).   Specifically, Petitioner asserts that Thornton testified that he viewed the second videotape in Petitioner's trailer which could not be true because Olsson had already removed Petitioner's video camera at that point (Ex. 15 at 17).   The post-conviction court denied this claim on the basis that it was completely refuted by the record (Doc. 20 at 31). Florida's Second DCA *per curiam* affirmed (Ex. 21).

   A review of the testimony supports the state court's conclusions.   Thornton testified that he viewed about "five minutes" of the second videotape at his own home using his own video camera (T. at 223).   He testified that he was in the company of Layton and Detective Gianfrancesco at the time he viewed the videotape. Id.   Accordingly, the state court's determination that this claim was completely refuted by the record was neither contrary to Strickland nor based upon an unreasonable determination of the facts.   Claim 22 is denied pursuant to 28 U.S.C. § 2254(d).

**T.   Claims 25, 27, 31, and 35**

In Claim 25, Petitioner asserts that the state trial judge was biased against him (Doc. 1 at 45). Specifically, Petitioner asserts that "Judge Thompson verbally expressed his bias and prejudging of the case on the record. During trial, the Judge and the ASA have their own little conversation while the trial goes on." (Ex. 15 at 21). Petitioner also asserts that the court expressed an opinion that Petitioner would serve prison time before he was convicted. Id. Petitioner raised this claim in his Rule 3.850 motion where it was denied as procedurally barred because claims of judicial bias must be raised on direct appeal (Ex. 20 at 37).

In Claim 27, Petitioner asserts that the state prosecutor committed fraud upon the court by "presenting Thornton's perjured testimony during the hearing on [Petitioner's] motion to suppress and later at trial." (Doc. 1 at 48).[12] Claim 27 was dismissed as procedurally barred by the post-conviction court on the ground that "issues of prosecutorial misconduct are not cognizable in a collateral postconviction motion." (Ex. 20 at 39).

In Claim 31, Petitioner asserts that there was a lack of substantial evidence to sustain his conviction on count one because

---

[12] This claim is based upon the same facts regarding the call log set forth in Claim 17(Ex. 15 at 24).

there was no evidence of penetration (Doc. 1 at 54).  Petitioner raised this claim in his Rule 3.850 motion where it was summarily denied by the state post-conviction court as procedurally barred because it was an issue that should have been raised on direct appeal (Ex. 20 at 43).

In Claim 35, Petitioner asserts that counsel was ineffective for failing to present evidence at the evidentiary hearing on his motion to suppress that Thornton lied about receiving calls from the Lee County Jail.[13]  Petitioner raised this claim in his amended Rule 3.850 motion, but the claim was summarily denied as untimely and procedurally barred (Ex. 20 at 2).

A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.  Judd v. Haley, 250 F.3d 1308 (11th Cir. 2001).  Accordingly, a federal habeas court cannot consider a claim where "the last state court rendering a judgment in the case clearly and expressly state[d] that its judgment rests on a state procedural bar." Parker v. Sec'y, Dep't of Corr., 331 F.3d 764, 771 (11th Cir. 2003) (quotation marks and citations omitted).

---

[13] This claim is also based upon the same facts regarding the call log set forth in Claim 17 (Ex. 15 at 24).

Under Florida law, a claim is procedurally barred from being raised on collateral review if it could have been, but was not, raised on direct appeal. See Smith v. State, 445 So.2d 323, 325 (Fla. 1983) ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack."); Philmore v. McNeil, 575 F.3d 1251 (11th Cir. 2009) ("Florida law bars claims in a state post-conviction proceeding that could have been raised on direct appeal."). Petitioner has made no claim that this rule is not regularly followed by the Florida courts.  Indeed, Rule 3.850 of the Florida Rules of Criminal Procedure, which governs the collateral review process in Florida states that ""[t]his rule does not authorize relief on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence." See also Bates v. Dugger, 604 So.2d 457, 458 (Fla. 1992)("Rule 3.850 does not authorize relief based upon grounds which could have been or should have been raised at trial and, if properly preserved, on direct appeal.")(quotation marks and citation omitted).  In addition, a Rule 3.850 motion generally must be filed within two years from when the judgment and sentence become final. See Baker v. State, 878 So. 2d 1236, 1244 (Fla. 2004); Fla. R. Crim. P. 3.850(b) (providing a two-year limitations period); Fla. R. Crim P. 3.850(f) (barring the filing of second or

successive post-conviction motions); <u>Durkin v. Sec'u, Fla. Dep't of Corr.</u>, No. 5:11-cv-365-MP-CJK, 2013 WL 6768332, at *28 (N.D. Fla. December 20, 2013) ("Florida's rule prohibiting the filing of untimely and successive postconviction motions is firmly established and regularly followed.").

The state post-conviction court expressly relied upon independent and adequate state procedural bars to reject these claims. Because the state appellate court affirmed *per curiam* without written opinion, the decision is presumed to rest on the procedural bar. See <u>Harmon v. Barton</u>, 894 F.2d 1268, 1270 (11th Cir. 1990) (where state trial court finds procedural default, state appellate court's silent affirmance is a finding of procedural default by the last state court to rule on the question).

Petitioner has not argued that there is any cause to excuse his procedural default of any of these claims. Each of the alleged instances of judicial bias were known to Petitioner at the time he filed his direct appeal. Petitioner knew of Thornton's alleged lie regarding Petitioner's telephone call from the Lee County Jail prior to filing his direct appeal. Petitioner was aware, prior to his direct appeal and his first Rule 3.850 motion, of the extent of the state's evidence regarding penetration. Finally, Petitioner has not presented new reliable evidence showing that he

is actually innocent.   Accordingly, each of these claims is dismissed as procedurally barred.

**U.   Claim 28**

Petitioner asserts that trial counsel "misadvised [Petitioner] with respect to his will to testify." (Doc. 1 at 49). Petitioner asserts that he waived his right to testify on his own behalf because counsel promised him that, if he did so, she would call four witnesses who would impeach the testimony of T.O., Olsson, and Thornton (Ex. 16 at 1-4).  The post-conviction court denied this claim because Petitioner's alleged reason for waiving his right to testify was refuted by the record:

> Notably, Defendant asserts that his counsel promised him that she would call certain witnesses if Defendant did not testify; however, the record reflects that both counsel and the trial court pointed out that the defense was ready to rest by the time Defendant was being asked whether he wanted to testify or not.  Defendant was sworn in and a colloquy with the trial court ensued about whether or not Defendant wished to testify. During this Colloquy, Defendant was made aware that he had the discretion to testify if he so desired and in fact discussed the issue with his counsel prior to being sworn in.   Had Defendant relied on promises, then he would have had an affirmative duty to speak up if the attorney had promised something different. See Flores v. State, 57 So. 3d 218 (Fla. 4th DCA 2010) (holding that a defendant's sworn answer during a plea colloquy must mean something and that a defendant has an affirmative duty to speak up if the attorney has promised something different).   The Defendant had actual notice that the defense

> was about to rest its case if he chose not to
> testify, so the Defendant could not have sat
> idly by while the alleged promised made to him
> was clearly not going to happen.  The trial
> court made a determination that Defendant
> knowingly, voluntarily, and intelligently
> made a decision to waive his right to testify,
> and there is competent substantial evidence
> that Defendant knew the defense was about to
> rest and no more witnesses would be called;
> therefore, Defendant has failed to demonstrate
> any entitlement to relief on this issue.
> Furthermore, faced with the abundance of
> evidence against him, there seems to be no
> reasonable probability that the outcome of the
> trial would have been any different even had
> Defendant testified.

(Ex. 20 at 39-40) (internal citations to the record and footnote omitted).  Florida's Second DCA *per curiam* affirmed (Ex. 21).

The state court reasonably concluded that Petitioner did not rely on counsel's alleged promise to call additional witnesses when deciding not to testify at trial.  Defense counsel stated in open court that the defense was ready to rest <u>prior</u> to the trial court's discussion with Petitioner regarding his right to testify (T. at 485).  Accordingly, Petitioner was aware that the defense would not call additional witnesses at the time he waived his right to testify, yet he still told the trial court that he did not wish to testify and was comfortable with that decision (T. at 486).

The representations made by Petitioner at trial constitute "a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of

verity." <u>Blackledge v. Allison</u>, 431 U.S. 63, 73-74 (1977). The record and Petitioner's sworn trial testimony undermine his current claim that he only waived his right to testify because he believed that counsel would call additional witnesses in his defense. Further, the fact that Petitioner expressed no concerns about his decision not to testify, despite counsel's statement to the court that it was prepared to rest its case, defeats his present allegation that his attorney promised to call additional witnesses if Petitioner waived his right to testify.

Petitioner's unsubstantiated allegations are insufficient to establish that his decision not to testify was the product of ineffective assistance of counsel. Therefore, the state court's conclusion that this claim was without merit is neither contrary to <u>Strickland</u> nor based upon an unreasonable determination of the facts. Claim 28 is denied pursuant to 28 U.S.C. § 2254(d).

**V.   Claims 29 and 30**

In Claims 29 and 30, Petitioner asserts that trial counsel was ineffective for failing to object to the jury's verdicts on counts one and two because the jury did not make specific findings of the essential elements for those offenses (Doc. 1 at 51-53). Specifically, Petitioner asserts that the jury was required to make a specific finding that T.O. was under the age of eighteen

when he engaged in sexual activity with her (Ex. 17 at 7).[14]
Petitioner cites <u>Insko v. State</u>, 969 So. 2d 992 (Fla. 2007) and
<u>Rogers v. State</u>, 963 So. 2d 328 (Fla. 2d DCA 2007) in support of
his assertion that "a verdict must reflect a criminal defendant's
guilt of each and every essential element of the charged offense."
<u>Id.</u> at 6-7.

Petitioner raised these claims in his Rule 3.850 motion and
the post-conviction court denied them, noting that "[c]ontrary to
what Defendant asserts, the cases cited by Defendant in his motion
in support of this Ground reflect that a charging document must
reflect all of the essential elements of a crime, not that a jury
verdict form must include a specific finding for each element."
(Ex. 20 at 41).   Florida's Second DCA *per curiam* affirmed (Ex.
21).

It is not this Court's province to re-examine state court
determinations on questions of state law. See <u>Tejada</u>, 941 F.2d at
1560 ("We review questions of state law in federal habeas
proceedings only to determine whether the alleged errors were so
critical or important to the outcome of the trial to render 'the

---

[14] In Claim 30, Petitioner directs the Court to a portion of
his Rule 3.850 motion in which he again argues that the state did
not prove that T.O. was "penetrated" by his finger (Doc. 1 at 53).
Because this issue has already been addressed by the Court in
Claims 3, 6, 7, 23, and 27, it will not be re-addressed in Claim
30.

entire trial fundamentally unfair.'"").  To the extent Petitioner
now complains that the post-conviction court unreasonably
concluded that state law does not require a jury to make specific
findings of a victim's age on the verdict form, he has not stated
a basis for federal habeas corpus relief.  Moreover, as discussed
above, the court properly instructed the jury as to each element
of counts one and two and the jury was tasked with determining if
the victim was the requisite age. See discussion supra Parts III
(A)-(D). There was simply no error to which counsel could have
objected.  The state court's adjudications of Claims 29 and 30
were neither contrary to Strickland nor based upon an unreasonable
determination of the facts.  The claims are denied pursuant to 28
U.S.C. § 2254(d).

**W.   Claim 33**

Petitioner asserts that trial counsel was ineffective for
failing to call Wendi Braswell, and Elsa Gatjons to testify that
T.O. was not ignorant of the videotape production of the second
videotape as she alleged at trial (Doc. 1 at 57-58).[15] Petitioner
asserts that Elsa had testified at a deposition that T.O. once

---

[15] Petitioner attempted to expand upon this issue in his
"amended" Rule 3.850 motion which was dismissed by the post-
conviction court as untimely and procedurally barred (Ex. 20 at
2).  Because this court will not address a procedurally barred
claim, Claim 33 is addressed only to the extent raised in
Petitioner's first Rule 3.850 motion. See discussion supra Claims
25, 27, 31, and 35.

filmed her pulling the covers from Petitioner while he was sleeping nude (Ex. 15 at 12). He also asserts that T.O. admitted to Wendi Braswell that she "participated in making videotapes of the sexual acts." Id. Petitioner asserts that the testimony of these witnesses would have shown that "the second movie was not filmed by Defendant at all." Id.

The post-conviction court denied this claim, first noting that Florida law would not have allowed counsel to impeach T.O. with Elsa's deposition testimony (Ex. 20 at 23). The post-conviction court also determined that Petitioner had not demonstrated any prejudice:

> Defendant was convicted on two counts of promoting a sexual performance by a minor, which includes elements that a defendant produced, directed, or promoted a performance that includes sexual conduct by a child, and that a defendant knew the character and content of the performance. Fla. Stat. § 827.071. Defendant argues in his motion that impeaching the victim's testimony that she never made nude movies without the Defendant's knowledge is "crucial" to his defense, because he contends he did not make the video turned over to police by Kurt Thornton. The record reflects that when asked by the State during direct examination if she had ever made a nude movie that she did not tell the Defendant about, the victim responded "no."
>
> Kurt Thornton testified that at the Defendant's behest, he went to Defendant's trailer to retrieve an 8mm video tape, the very same videotape that Defendant claims in his motion he never made. Mr. Thornton's testimony is evidence that the Defendant was

at least aware of the existence of the tape,
and the Defendant's desire that the tape be
removed from his home while he was in jail is
evidence that he was aware of the character
and contents of the tape as well.
Furthermore, for purposes of the second
element of the charged offense, "produced,
directed, or promoted," promoted "means to
procure, manufacture, issue, sell, give,
provide, lend, mail, deliver, transfer,
transmute, publish, distribute, circulate,
disseminate, present, *exhibit*, or advertise to
offer or agree to do the same." § 827.071(c)
(emphasis added). To "exhibit" a performance
"does not require that the sexual performance
be exhibited to third persons," because "[a]n
'audience' can consist of a single individual
and that individual can be the defendant."
Bishop v. State, 46 So. 3d 75, 79 (Fla. 5th
DCA 2010) (*citing* State v. George, 717 S.W. 2d
(M. Ct. App. 1986)). The attempt by the
Defendant to have the tape retrieved is
evidence that he knew the content and
character of the tapes, which means he would
have had to have watched the tape. If, as
Defendant alleges, he did not make the video
himself, there was still competent,
substantial evidence presented at trial that
Defendant promoted, "exhibited," the video,
even if only to watch the tape himself.
Accordingly, no reasonable probability exists
that the outcome of the trial would have been
different even if counsel had impeached the
victim's testimony; therefore, Defendant has
failed to demonstrate prejudice and Claim N is
without merit.

Id. at 24-25 (internal citations to the record omitted).

Florida's Second DCA *per curiam* affirmed (Ex. 21).

    To the extent Petitioner now claims that the state court

misapplied Florida law in denying this claim, he has not stated a

basis for federal habeas corpus relief. See discussion supra Part

III(A).  Moreover, evidence was presented at trial that Petitioner asked Thornton to retrieve the second videotape from Petitioner's trailer which belies his current assertion that he was unaware of the tape's existence or contents (T. at 222, 223, 227, 237, 248, 255, 264).  The trial court reasonably determined that Petitioner was aware that the videotape was made and that Petitioner violated Florida Statute § 827.071(3) by exhibiting the videotape.  Whether T.O. *also* knew of the tape's existence is irrelevant to Petitioner's guilt under § 827.071(3) because making or exhibiting a video showing a child involved in sexual conduct violates Florida Statute § 827.071(3), even if the child was a willing participant. See <u>Bishop v. State</u>, 46 So.3d 75 (Fla. 5th DCA 2010)(conviction permitted under § 827.071 "even where the video tape of the child's engagement in sexual conduct was not shown to third persons."); <u>Ladd v. State</u>, 715 So.2d 1012 (Fla. 1st DCA 1998)(making of motion picture or video tape that involves sexual conduct by child less than eighteen years of age is in and of itself sufficient to constitute performance).

Based upon the foregoing, the post-conviction court's conclusion that Petitioner cannot show prejudice from counsel's failure to impeach T.O. as to her knowledge of the video camera, was neither contrary to <u>Strickland</u> nor based upon an unreasonable

determination of the facts.   Claim 33 is denied pursuant to 28 U.S.C. § 2254(d).

Any of Petitioner's allegations not specifically addressed herein have been found to be without merit.

## IV.   Certificate of Appealability[16]

Petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1).   Rather, a district court must first issue a certificate of appealability ("COA").   "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, Petitioner must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El, 537 U.S. at 335-36. Petitioner has not made the requisite showing in these circumstances.

---

[16] Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Id. As this Court has determined that Petitioner is not entitled to habeas corpus relief, it must now consider whether Petitioner is entitled to a certificate of appealability.

Because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis.*

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Claims 1, 25, 27, 31, and 35 of the 28 U.S.C. § 2254 petition for habeas corpus relief filed by Patrick O'Leary (Doc. 1) are **DISMISSED**; alternatively, Claim I is **DENIED;** all remaining claims are **DENIED.**

2. Petitioner is **DENIED** a certificate of appealability.

3. The Clerk of Court is directed to terminate any pending motions, enter judgment accordingly, and close this case.

**DONE** and **ORDERED** in Fort Myers, Florida on this ___27th___ day of April, 2015.

                                                          

JOHN E. STEELE
UNITED STATES DISTRICT JUDGE

SA: OrlP-4
Copies: Patrick E. O'Leary
Counsel of Record